IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

MICHAEL PAIGE,                          )
                                        )
            Plaintiff,                  )
                                        )
v.                                      )   CIVIL ACTION NO. 16-0383-MU
                                        )
NANCY A. BERRYHILL,                     )
Acting Commissioner of Social           )
Security,                               )
                                        )
            Defendant.                  )

## MEMORANDUM OPINION AND ORDER

Plaintiff Michael Paige brings this action, pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3), seeking judicial review of a final decision of the Commissioner of Social

Security ("the Commissioner") denying his claim for Supplemental Security Income

("SSI"), based on disability. The parties have consented to the exercise of jurisdiction by

the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings in this Court.

(Doc. 26 ("In accordance with the provisions of 28 U.S.C. 636(c) and Fed. R. Civ. P. 73,

the parties in this case consent to have a United States Magistrate Judge conduct any

and all proceedings in this case, . . . order the entry of a final judgment, and conduct all

post-judgment proceedings.")). Upon consideration of the administrative record, Paige's

brief, the Commissioner's brief, and the arguments of counsel at the May 10, 2017,

hearing before this Court, it is determined that the Commissioner's decision denying benefits should be affirmed.[1]

## I.  PROCEDURAL HISTORY

Paige applied for SSI, based on disability, under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 1381-1383d, on December 11, 2012, alleging disability beginning on December 1, 2012. (Tr. 118). His application was denied at the initial level of administrative review on May 2, 2013. (Tr. 64-69). On June 12, 2013, Paige requested a hearing by an Administrative Law Judge (ALJ). (Tr. 72-74). After a hearing on July 30, 2014, the ALJ issued an unfavorable decision finding that Paige was not under a disability from the date the application was filed through the date of the decision, December 11, 2014. (Tr. 17-28). Paige appealed the ALJ's decision to the Appeals Council, which denied his request for review of the ALJ's decision on June 1, 2016. (Tr. 1-6).

After exhausting his administrative remedies, Paige sought judicial review in this Court, pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (Doc. 1). The Commissioner filed an answer and the social security transcript on October 17, 2016. (Docs. 11, 12). After both parties filed briefs setting forth their respective positions, the Court conducted a hearing on this matter on May 10, 2017. (Docs. 14, 23). The case is now ripe for decision.

---

[1] Any appeal taken from this Order and Judgment shall be made to the Eleventh Circuit Court of Appeals. *See* Doc. 26. ("An appeal from a judgment entered by a Magistrate Judge shall be taken directly to the United States Court of Appeals for the judicial circuit in the same manner as an appeal from any other judgment of this district court.").

## II.  CLAIM ON APPEAL

The sole claim on appeal is whether the ALJ erred in rejecting the medical opinions of the consultative examiner, Dr. Judy Travis, and the psychological examiner, Dr. John Goff, thereby rendering his residual functional capacity ("RFC") assessment unsupported by substantial evidence. (Doc. 14 at p. 1).

## III. BACKGROUND FACTS

Paige was born on October 5, 1965, and was 47 years old at the time he filed his claim for benefits. (Tr. 27). Paige alleged disability due to pain in his legs, pain in his left hip, pain in his right shoulder, and problems sleeping due to pain. (Tr. 555). Paige graduated from high school in 1984 in regular classes. (Tr. 139). He has worked as a furniture mover, lubrication technician, log handler, car detailer, and delivery driver. (Tr. 61). He engages in normal daily activities; such as, personal care, cooking meals, washing dishes, mowing the yard, taking walks, shopping, watching television, and socializing. (Tr. 58).

After conducting a hearing, the ALJ found that Paige had the following severe impairments: arthritis, degenerative joint disease, and schizoid personality disorder. (Tr. 19). He further determined that none of these impairments met or equaled a listing. (Tr. 19). The ALJ assessed Paige's RFC and found that he could perform light work, with additional exertional, postural, environmental, and mental limitations, and that considering these limitations, his age, education, and work experience, Paige could perform other work existing in the national economy. (Tr. 21-27). Accordingly, the ALJ concluded that Paige was not entitled to benefits. (Tr. 28).

# IV. ALJ'S DECISION

The portion of the ALJ's Decision that is relevant to the issue presented is as follows:

> **4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant occasionally can push or pull with upper left and lower extremities. He can never climb ladders, ropes, scaffolds but he can occasionally climb ramps and stairs. He occasionally can balance, kneel, crouch, crawl, and stoop. He occasionally can reach overhead and otherwise frequently reach with his upper left extremity. He should avoid concentrated exposure to extreme temperatures and vibration. The claimant should avoid all exposure to dangerous machinery, unprotected heights and any work requiring walking on uneven terrain. During a regularly scheduled workday, or the equivalent thereof, the claimant can understand and remember short and simple instructions, but is unable to do so with detailed or complex instructions. He can perform simple, routine, repetitive tasks, but is unable to do so with detailed or complex tasks. He can deal with changes in the workplace, if introduced occasionally and gradually, and are well-explained.**
>
> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.
>
> While receiving emergent care for abdominal and chest pain on February 16, 2011 that was ultimately diagnosed as constipation, an x-ray also revealed arthritic changes in the claimant's hips. However, he denied any musculoskeletal problems during the review of systems (Exhibit 2F, pgs. 3-17).

The objective record is decidedly sparse for evidence documenting any treatment for the claimant's alleged disabling conditions. Indeed, the bulk of objective evidence in this case concerns the claimant's history of substance and alcohol abuse (Exhibit 4F). On October 8, 2012, the claimant initiated treatment at West Alabama Mental Health Center ("WAMHC") for alcohol and marijuana abuse. He denied any legal problems because of his use, but admitted that his consumption of alcohol had increased and that withdrawal symptoms of anxiety and feelings of sadness, tenseness, and anger hindered his ability to maintain employment. Indeed, **the treating provider noted that the claimant's work history was " sporadic;" nevertheless, the claimant admitted that he was currently working part-time cutting grass and washing cars, despite his allegation of chronic left hip pain.**

The mental status examination was largely unremarkable but for the claimant displaying a sad facial expression and mildly impaired recent and remote memories. Alcohol abuse and cannabis abuse were diagnosed and a Global Assessment of Functioning ("GAF") score of 55 was assigned, which indicates only moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers) according to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM-IV") (Id. at pgs. 4-25) (emphasis added).

The recent abandonment of GAF scores and the inherent subjectivity used to determine them precludes their use as dispositive evidence in a disability decision or indicative of the severity threshold for mental impairments. Accordingly, the claimant's GAF score received weight only to the extent that it is supported by the objective record.

The claimant consistently attended monthly appointments at WAMHC and eventually achieved sobriety. Throughout his near monthly appointments, he rarely reported any problems and no psychological abnormalities were detected. **On December 3, 2012, he reported that he**

**continued to work part-time performing "odd jobs" to "stay productively busy"** (Id. at pg. 47) (emphasis added). Although primary insomnia was diagnosed, this condition was well- managed with medication, from which the claimant denied any side effects (Id. at pg. 51) (emphasis added).

It should be noted that the objective record reveals no evidence documenting ongoing marijuana or alcohol use or limitations from it; therefore, the undersigned finds it immaterial in this decision.

The claimant submitted a disability application on December 13, 2012 (Exhibit 2E). He alleged that sleep disturbance and pain in his legs, left, hip, and right shoulder limited his ability to work. **Notably, the claimant admitted that he stopped working on August 30, 2004 because "no work available" -not because of his alleged disabling conditions** (Id. at pgs. 2) (emphasis added).

In a function report, the claimant asserted that his conditions affected his ability to lift, bend, stand, sit, and kneel. He alleged the ability to walk only one-half block before needing a 20-minute rest period. He attributed sleep disturbance to hip pain and cramps and generally alleged, "I can't do much now."

Despite his alleged limitations, the claimant managed to complete various activities. He admitted handling his own personal care, preparing meals, washing dishes, and cutting grass. Further, he reported shopping in stores for groceries and clothing while managing his own finances. He socialized with others via telephone and in person while also regularly attending church. He admitted maintaining attention and following written and verbal instructions well. Additionally, he denied any problems handling stress or changes in routine and denied being fired from a job for failing to get along with others (Exhibit 3E, pgs. 1-8).

The claimant also completed a pain questionnaire. He reported the onset of nearly constant pain in his right shoulder, left hip, knees, and legs in January 2006 and

alleged that it was exacerbated by "bad weather, moving the wrong way, and trying to kneel down." Notably, **he admitted that Aleve, an over-the-counter medication, was effective in relieving his pain symptoms without any side effects** (Exhibit 5E) (emphasis added).

The undersigned carefully considered the claimant's reports. Despite his allegations, the responses do not support extensive limitation. Accordingly, his reports warranted some, but not great, weight.

After the claimant's application initially was denied, he submitted an appeal report on June 13, 2013 alleging worsening pain in his hip, leg, and lower back. He denied the onset of any new conditions (Exhibit 9E, pg. 1).

The claimant underwent a physical consultative examination on April 9, 2013 in conjunction with his disability application. Here, he reported pain in his legs, knees, left hip, and right shoulder. The claimant attributed minimal medical treatment of his symptoms to a lack of financial resources but the examining physician, Judy Travis, M.D., noted that the claimant had a daily smoking habit for the previous three years. Upon examination, she found tenderness to palpation and percussion in the claimant's back and some difficulty squatting but no other remarkable findings. Indeed, the **claimant enjoyed normal range of motion in his back, hips, and knees; normal gait without assistance; normal grip strength and dexterity in his upper extremities; and no neurological deficits**. Ultimately, Dr. Travis diagnosed joint pain and traumatic arthropathy of the shoulder (Exhibit 1F, pgs. 1-5) (emphasis added).

Therefore, while Dr. Travis did not opine as to the claimant's ability to engage in work here, the undersigned finds that the dearth of findings indicating any significant physical abnormalities is quite compelling and substantiates the ultimate decision in this case. Accordingly, this assessment received substantial weight.

During an appointment at WAMHC on April 11, 2013, the claimant displayed a euthymic mood and reported sobriety as well as his intention to stop smoking cigars. He

**reported being in good spirits because of seasonally warmer weather, in that "he is able to work outdoors and do other activities outdoors, which he enjoys doing"** (Exhibit 4F, pgs. 39-40) (emphasis added).

On July 3, 2013, the claimant returned to Dr. Travis to establish care. Contrary to his allegations of pain in multiple areas during the consultative examination three months earlier, here, he only sought treatment for left hip pain. The results of the corresponding physical examination were unchanged, including the finding of normal range of motion in his hips and knees without atrophy. Dr. Travis assessed joint pain, a hip injury, and hip deformity but administered conservative treatment with only one prescription medication (Exhibit 3F, pgs. 2-4).

**The claimant expressed the desire to work on November 4, 2013 during a psychiatric appointment at WAMHC, where he reported "doing fine" with good sleep and appetite.** Consequently, he was referred to supported employment by the treating psychiatrist, Swati Poddar, M.D. (Exhibit 4F, pg. 71). Quite contradictorily, the claimant's therapist, James Ward, opined less than one month later, "due to physical and cognitive impairment, client [the claimant] will likely not be able to work in the future," citing the claimant's complaints of finger numbness in cold weather, back pain, and avoidance of heavy lifting. Mr. Ward further opined that the claimant's "primary problem at this point in time seems to be his physical/medical conditions" (Id. at pgs. 66-67) (emphasis added).

Per SSR 06-03p, the undersigned must consider several factors in evaluating a medical source statement ("MSS"), such as how long the source has known and how frequently the source has seen the individual; how consistent the opinion is with other evidence; the degree to which the source presents relevant evidence to support an opinion; how well the source explains the opinion; and whether the source has a specialty or area of expertise related to the individual's impairment(s). While the record clearly demonstrates that Mr. Ward has been the claimant's therapist, absolutely nothing in the longitudinal objective record substantiates his MSS regarding the claimant's

conditions, particularly since his opinion concerns an area of expertise for which he is not qualified to opine. Therefore, the undersigned justifiably afforded his MSS little weight. Indeed, as further evidence of Mr. Ward's incongruent findings regarding the claimant's conditions, he noted on May 14, 2014, "client [the claimant] is in good health" excepting "an upset stomach" that the claimant treated with over-the-counter antacids (Exhibit *5F*, pg. 4).

During an appointment at WAMHC on June 11, 2014, the claimant reported good sleep and denied any substance use although he admitted "occasional" consumption of a wine cooler. He indicated that his girlfriend provided a good support system and provided transportation because his driver's license had been revoked following a charge for driving under the influence in 1991. He reported that he had not attempted to have it reinstated; however, here, he suggested that he had considered doing so, but for the cost-prohibitive fee (Id. at pg. 2).

The claimant underwent a psychological examination at the behest of his representative on June 30, 2014 (Exhibit 6F). Here, he reported that he stopped working in 2004 because of problems with his hip, which is inconsistent with his admission in his disability application that he only stopped working because of difficulty finding employment. Further, he stated that he no longer drove because of problems with his back and had poor sleep due to pain, which is inconsistent with his discussion of reinstatement of his driver's license earlier in the month to a different treating source and the longitudinal records from WAMHC wherein the claimant consistently reported good sleep with medication. Rather contradictorily, the examining psychologist, John Goff, Ph.D., opined, "he is a straightforward person," despite finding **"some subtle suggestions that he [the claimant] attempted to portray himself in a somewhat negative light."** The claimant discussed his educational background, reporting that he graduated from high school with a regular diploma.

Upon examination, Dr. Goff found that "he did not appear to be particularly apprehensive or anxious" and noted "generally logical and coherent discourse." The claimant walked "very slowly" with a limp and Dr. Goff noted, "he did

appear to be somewhat uncomfortable;" however, **the claimant admitted that his left hip pain was "not as bad as it used to be**." The Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS-IV") was administered, where after the claimant earned a full-scale IQ score of 80, verbal comprehension score of 80, perceptual reasoning score of 76, working memory score of 97, and processing speed score of 89, which Dr. Goff determined placed him in the borderline to low average range of intellectual functioning. Ultimately, Dr. Goff diagnosed pain disorder with psychological features with a general medical condition and schizoid personality disorder. While he found that the claimant could understand, carry out, and follow moderately complex instructions, he also opined that the claimant could not interact very well with others and that his personality disorder and left hip pain would be "significant impediment[s] to vocational activity." Indeed, he completed a MSS indicating that the claimant had marked limitation in maintaining concentration, persistence, and pace as well as constriction of interests (Id. at pgs. 1-8).

Dr. Goff has grossly exaggerated the extent of the claimant's conditions, as the lack of any supportive objective evidence and the claimant's own subjective reports belie his findings. Therefore, although the undersigned acknowledged Dr. Goff's diagnoses, his opinions were generally inconsistent with the record and received minimal weight.

Dr. Travis completed an MSS on August 12, 2014 finding that the claimant could lift and carry up to 50 pounds, sit up to 8 hours, and stand/walk less than one hour in normal workday. Additionally, she assessed some postural and manipulative limitations while also opining that the claimant would have more than three absences per month. Notably, she admitted that the left hip pain was not objectively confirmed and that it did *not* prevent the claimant from maintaining concentration, persistence, and pace of at least two-hour periods (Exhibit 7F, pgs. 1-2). The undersigned afforded Dr. Travis's opinion some weight, as the medical record is devoid of any objective evidence reflecting significant physical abnormalities; however, her finding that the claimant would be expected to have more than three absences per month lacks sufficient support.

Against this backdrop, the claimant appeared and testified at length. He testified that he lived with a friend and received food stamps. Interestingly, the claimant stated that he never had a valid driver's license and relied on a friend to bring him to the hearing. He admitted that he left his last job because the business closed and supported himself thereafter with odd jobs, such as cutting grass and painting.

The claimant's representative elicited testimony regarding the claimant's left hip and specifically directed him regarding difficulty walking because of it, which the representative described thusly: "you were all bent over walking down that long hall," to which the claimant agreed. Indeed, the claimant's representative directed him to provide a demonstration of his gait and station, wherein the claimant walked very slowly in apparent pain; however, the undersigned observed the claimant walked into the hearing room quickly. The claimant went on to testify that he could sit no longer than 15 minutes before needing to alternate positioning, stand only 10 minutes, and walk half the length of a football field only slightly faster than a snail's pace. Further, he testified that he laid down approximately 2 hours per day because of pain symptoms.

**In describing his daily activities, the claimant testified that he performed personal hygiene, prepared food, feed his pet, swept the floor, and walked approximately 100 yards for leisure, which is rather contradictory to his testimony regarding difficulty walking.** The claimant also testified that he experienced left shoulder pain, which he rated as a 6 or 7 on a pain scale from 1 to 10. Additionally, he testified that pain disrupted his sleep.

The undersigned carefully considered the claimant's testimony along with the medical, objective, and subjective evidence discussed above. To the extent that his testimony was consistent with that evidence, it is reflected in the residual functional capacity. Beyond that extent, the claimant's testimony simply was not consistent with or supported by the medical or objective evidence of record.

In short, neither the objective medical evidence, nor the claimant's objectively unsupported documentary and testimonial

statements establishes that his ability to function has been so severely eroded as to preclude all work activity. However, the undersigned assessed a residual functional capacity which gives the claimant every benefit of the doubt possible under the applicable laws, rulings and regulations and which, at the same time, can be found to be at least somewhat consistent with the objective medical records. In doing so, and despite the minimal nature of the objective evidence and apparent exaggerations and inconsistencies to be found in the claimant's testimonial and documentary statements, the undersigned finds that the claimant is capable of work at a light exertional level with the additional limitations referred to above.

The undersigned finds that the cumulative weight of the credible evidence in favor of a finding that the claimant's ability to function has not been so severely eroded as to preclude all work activity far exceeds the cumulative weight of the credible evidence supporting a finding of total disability.

(Tr. 21-26).

## V. DISCUSSION

A claimant is entitled to an award of SSI benefits if the claimant is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or last for a continuous period of not less than 12 months. *See* 20 C.F.R. § 416.905(a). The impairment must be severe, making the claimant unable to do the claimant's previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-11. "Substantial gainful activity means work that … [i]nvolves doing significant and productive physical or mental duties [that] [i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510.

In all Social Security cases, an ALJ utilizes a five-step sequential evaluation in determining whether the claimant is disabled:

> (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the severe impairment meets or equals an impairment in the Listing of Impairment in the regulations; (4) if not, whether the claimant has the RFC to perform her past relevant work; and (5) if not, whether, in light of the claimant's RFC, age, education and work experience, there are other jobs the claimant can perform.

*Watkins v. Comm'r of Soc. Sec.,* 457 F. App'x 868, 870 (11th Cir. 2012) (per curiam) (citing 20 C.F.R. §§ 404.1520(a)(4), (c)-(f), 416.920(a)(4), (c)-(f); *Phillips v. Barnhart,* 357 F.3d 1232, 1237 (11th Cir. 2004)) (footnote omitted). The claimant bears the burden of proving the first four steps, and if the claimant does so, the burden shifts to the Commissioner to prove the fifth step. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).

The reviewing court must determine whether the Commissioner's decision to deny benefits was "supported by substantial evidence and based on proper legal standards." *Winschel v. Comm'r of Soc. Sec.,* 631 F.3d 1176, 1178 (11th Cir. 2011) (citations omitted); *see* 42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Winschel*, 631 F.3d at 1178 (citations omitted). "In determining whether substantial evidence exists, [the reviewing court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The reviewing court, however, "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." *Id*. When a decision is supported by substantial evidence, the reviewing court must affirm "[e]ven if [the court] find[s] that the evidence preponderates against the Secretary's decision." *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). "A clearly articulated credibility finding

with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995).

In this case, Paige asserts that the ALJ erred in rejecting the medical opinions of Dr. Travis and Dr. Goff. Paige also argues that the ALJ's residual functional capacity (FRC) assessment is not supported by substantial evidence because Dr. Travis and Dr. Goff rendered the only medical opinions. The Commissioner asserts that the ALJ provided valid reasons for the weight accorded the doctors' opinions, that those findings are supported by substantial evidence, and that the ALJ's evaluation of their opinions is entitled to deference.

"In assessing whether a claimant is disabled, an ALJ must consider the medical opinions in a case record ***together with the rest of the relevant evidence received***." *Chambers v. Comm'r of Soc. Sec.*, 662 F. App'x 869, 870 (11th Cir. 2016) (citing 20 C.F.R. § 404.1527(b)) (emphasis added). The relevant social security regulations provide that medical opinions are weighed by considering the following factors: 1) whether the source of the opinion examined the claimant; 2) whether the source treated the claimant and, if so, a) the length of the treatment relationship and the frequency of examination and b) the nature and extent of the treatment relationship; 3) the supportability of the opinion with relevant evidence and by explanations from the source; 4) the consistency of the opinion with the record as a whole; 5) whether the opinion was offered by a specialist about a medical issue related to his or her area of specialty; and 6) any other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(1)-(6); *see also Nichols v. Comm'r, Soc. Sec. Admin.*, No. 16-11334, 2017 WL 526038, at * 5 (11th Cir. Feb. 8, 2017) (citing 20 C.F.R. §§ 404.1527(c),

416.927(c)) ("In determining how much weight to give a medical opinion, the ALJ considers such factors as the examining or treating relationship, whether the opinion is well-supported, whether the opinion is consistent with the record, and the doctor's specialization.").

*"[T]he more consistent an opinion is with the record as a whole, the more weight the ALJ will give to that opinion." Chambers*, 662 F. App'x at 871 (citing 20 C.F.R. 404.1527(c)(4)) (emphasis added). The ALJ is to consider the claimant's daily activities when evaluating the symptoms and severity of an impairment. *Id*. (citing 20 C.F.R. § 404.1529(c)(3)(i)). The ALJ does not have to give a treating physician's opinion considerable weight if the claimant's own testimony about daily activities contradicts that opinion. *Id*. (citing *Phillips v. Barnhart,* 357 F.3d 1232, 1241 (11th Cir. 2004)). **If the claimant's own testimony regarding the claimant's daily activities contradicts the consulting physician's opinion, the ALJ's decision not to give the physician's opinion considerable weight is not in error.** *See id.* at 872 (emphasis added). "[A]n ALJ may reject any medical opinion if the evidence supports a contrary finding." *Nichols,* 2017 WL 526038, at *5 (citing *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985)); *see also Harris v. Comm'r Soc. Sec.,* 330 F. App'x 813, 816 (11th Cir. 2009) (holding that the ALJ did not err by rejecting the consultative psychologist's finding of severe impairment because the record evidence as a whole established that Plaintiff did not have deficits in adaptive functioning to meet Listing 12.05(D)).

Dr. Travis first examined Paige on April 9, 2013, at the request of the SSA. (Tr. 190). Paige reported pain in his legs, knees, left hip, and right shoulder. (*Id*.). Dr. Travis's physical examination revealed normal range of motion in his hips and knees

and no muscular atrophy. (Tr. 191). The only abnormal finding was difficulty squatting. (Tr. 190-91). Her assessment was pain in multiple joint sites and traumatic arthropathy shoulder. (Tr. 192). She did not provide a functional assessment. (Tr. 190-92). Paige returned to see Dr. Travis on July 3, 2013, complaining of chronic left hip pain. (Tr. 213). Again, all assessments, except for difficulty in squatting, were normal. (Tr. 213-15).

On August 12, 2014, more than one year after she had last seen Paige and at his attorney's request, Dr. Travis completed a one-page, check-the-box form titled "Medical Source Statement (Physical)" on which she indicated that Paige could sit for eight hours in an eight hour workday, but could stand or walk for less than one hour in an eight hour workday; that he could occasionally lift or carry fifty pounds and frequently lift and carry 25 pounds; that he did not require an assistive device to walk; that he was not required to avoid environmental irritants; that he could frequently use his hands for gross and fine manipulation, bend or stoop, and reach; that he could occasionally operate motor vehicles; and that he could rarely push or pull, climb, or balance, or work with or around hazardous machinery. She also opined that he would be absent more than three times per month. (Tr. 310). Dr. Travis wrote that the limitations she assessed were limitations normally expected from Paige's diagnoses, but also noted that the diagnoses in this case were not confirmed by objective medical findings. (*Id.*). She recommended an x-ray of his left hip.[2] (*Id.*). Dr. Travis also completed a form titled "Clinical Assessment of

---

[2] Dr. Travis indicated that Paige needed an x-ray of his left hip, and Paige criticizes the SSA for not ordering one. However, the record includes a report from x-rays of the abdomen and pelvis taken on February 16, 2011 that showed severe arthritic changes in the left hip. (Tr. 208). Although Paige contends that the ALJ "failed to acknowledge" the 2011 x-ray of his abdomen and pelvis, this contention is incorrect because the ALJ explicitly discussed that x-ray in his Decision and observed that it showed arthritic changes in Paige's hip. (Tr. 21-22).

Pain" at Paige's attorney's request, in which she stated that Paige has pain, but it "does not prevent functioning in everyday activities or work." (Tr. 311). She indicated that physical activity would increase his pain "to such a degree as to cause distraction from task or total abandonment of task," but she also stated that his pain would not prevent him "from maintaining attention, concentration or pace for periods of at least two hours." (*Id.*).

Based on his review of Dr. Travis's records and reports, as well as the other evidence in the record, the ALJ gave Dr. Travis's findings of April 9, 2013 "***substantial weight***." (Tr. 23). The ALJ gave the opinions set forth by Dr. Travis in the Medical Source Report on August 12, 2014 "***some weight***, as the medical record is devoid of any objective evidence reflecting significant physical abnormalities; however, her finding that the claimant would be expected to have more than three absences per month lacks sufficient support." (Tr. 25). Thus, contrary to Paige's contention that the ALJ rejected Dr. Travis's opinion, he actually did give a portion of it "substantial weight" and another portion "some weight." The Court notes that the ALJ concluded in his Decision that Paige's statements were not entirely credible, a finding that he has not challenged. (Tr. 25-26). Accordingly, the Court agrees that Dr. Travis's reliance on Paige's subjective complaints as the basis for her 2014 opinions detracts from the weight those opinions were due. *See Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159-60 (11th Cir. 2004) (holding that the ALJ's decision to discount the opinion of the plaintiff's treating physician because it was "inconsistent with his own treatment notes, unsupported by the medical evidence, and appear[ed] to be based primarily on [the plaintiff's] subjective

_____

complaints of pain" was supported by substantial evidence).

Paige also argues that the ALJ improperly rejected Dr. Goff's diagnosis of schizoid personality disorder. The ALJ found that "Dr. Goff has grossly exaggerated the extent of the claimant's conditions, as the lack of any supportive objective evidence and the claimant's own subjective reports belie his findings." (Tr. 25). Dr. Goff conducted a psychological evaluation of Paige at the request of his attorney on June 30, 2014. (Tr. 303). Dr. Goff diagnosed Paige with pain disorder and schizoid personality disorder. (Tr. 307). The ALJ gave minimal weight to Dr. Goff's opinion because it was based largely on Paige's unreliable subjective complaints and because it lacked support and was inconsistent with other evidence. (Tr. 25). With regard to Dr. Goff's opinion, the ALJ stated:

> The claimant underwent a psychological examination at the behest of his representative on June 30, 2014 (Exhibit 6F). Here, he reported that he stopped working in 2004 because of problems with his hip, **which is inconsistent** with his admission in his disability application that he only stopped working because of difficulty finding employment. Further, he stated that he no longer drove because of problems with his back and had poor sleep due to pain, **which is inconsistent** with his discussion of reinstatement of his driver's license earlier in the month to a different treating source and the longitudinal records from WAMHC wherein the claimant consistently reported good sleep with medication. **Rather contradictorily**, the examining psychologist, John Goff, Ph.D., opined, "he is a straightforward person," despite finding **"some subtle suggestions that he [the claimant] attempted to portray himself in a somewhat negative light."** …
>
> …The claimant walked "very slowly" with a limp and Dr. Goff noted, "he did appear to be somewhat uncomfortable;" however, **the claimant admitted that his left hip pain was "not as bad as it used to be**." … Ultimately, Dr. Goff diagnosed pain disorder with psychological features with a

general medical condition and schizoid personality disorder. While he found that the claimant could understand, carry out, and follow moderately complex instructions, he also opined that the claimant could not interact very well with others and that his personality disorder and left hip pain would be "significant impediment[s] to vocational activity." Indeed, he completed a MSS indicating that the claimant had marked limitation in maintaining concentration, persistence, and pace as well as constriction of interests (Id. at pgs. 1-8).

Dr. Goff has grossly exaggerated the extent of the claimant's conditions, ***as the lack of any supportive objective evidence and the claimant's own subjective reports belie his findings***. Therefore, although the undersigned acknowledged Dr. Goff's diagnoses, his opinions were generally inconsistent with the record and received minimal weight.

(Tr. 24-25) (italicized emphasis added).

The Court finds that substantial evidence supports the ALJ's finding that Dr. Goff's opinion was entitled to minimal weight because it was based largely on Paige's inconsistent and unreliable subjective complaints, as well as other inconsistencies in the record. *See, e.g.*, C*rawford*, 363 F.3d at 1159-60. As the ALJ noted, Paige told Dr. Goff that he stopped working in 2004 because of "problems with his hip." (Tr. 24; *see also* Tr. 303). However, he admitted in his disability application that he stopped working because he had difficulty finding employment. (Tr. 24; *see also* Tr. 138). Although Paige objects to the ALJ's statement that he has worked part-time since 2004, the record shows that Paige told his treating providers that he was "working part-time," mowing lawns, washing cars, performing "odd jobs," and staying "productively busy," (Tr. 222, 262). Paige apparently did not tell Dr. Goff about these activities.

Paige also told Dr. Goff that he no longer drove a car because of "problems with his back." (Tr. 24; *see also* Tr. 303). However, he earlier told a treating source that he stopped driving because his license had been suspended after he was convicted of driving under the influence (Tr. 24; *see also* Tr. 297).[3] In addition, Paige told Dr. Goff that he slept poorly due to pain. (Tr. 24; see also Tr. 304). Treatment notes from West Alabama Mental Health Center (WAHMC), however, consistently show that he reported sleeping well with medication. (Tr. 24; *see also* Tr. 219-295, 297-301).

While Dr. Goff opined that Paige had disabling mental limitations that prevented him from working, the ALJ noted that Paige did not stop working because of any alleged mental impairments. Rather, he stopped working because he had difficulty finding employment. (Tr. 23; *see also* Tr. 138). Similarly, while Dr. Goff opined, based on his examination, that Paige's gait was abnormal, Dr. Travis, a medical doctor, found that he had a normal gait and did not observe any gait-related problems. (Tr. 23; *see also* Tr. 191, 214). The ALJ also noted Paige's report that over-the-counter medication, like Aleve, relieved his pain without side effects. (Tr. 23; *see also* Tr. 154). In addition, although Dr. Goff opined that Paige was unable to sustain attention or concentration for two-hour periods, was socially withdrawn, and had other severe mental limitations, the ALJ observed that treatment notes from WAMHC, where he was seen and treated on multiple occasions, revealed normal mental findings, and did not indicate cognitive problems. (Tr. 219- 295, 297-301). Indeed, treatment notes from WAHMC specifically indicated that Paige had "No Problem" with attention span, concentration, social

---

3  He changed his story yet again at the hearing. When the ALJ asked Paige if he had a driver's license, he testified: "No sir, never had any driver's license, sir." (Tr. 38).

withdrawal, social activities with family, peers, or others, or in the ability to work. (Tr. 224). Dr. Travis also opined that his pain would not prevent him "from maintaining attention, concentration or pace for periods of at least two hours." (Tr. 311).

The ALJ also considered Paige's activities of daily living. (Tr. 23). Paige reported that he was able to perform personal care activities independently (Tr. 143, 144-45); prepared meals, including grits, eggs, toast, and bacon, on a daily basis (Tr. 145); performed house and yard work independently, without encouragement (Tr. 145); washed dishes and mowed the lawn (Tr. 145); went outside every day to walk (Tr. 146) and enjoyed taking walks of about 100 yards, the length of a football field, for leisure (Tr. 44); shopped in stores, rather than by phone, mail, or computer, for food and clothing (Tr. 146); was able to manage his own finances, including paying bills, counting change, handling a savings account, and using a checkbook and money orders (Tr. 146); watched television "everyday very well," and he did not note any difficulty paying attention to or concentrating on the programs he watched (Tr. 147); socialized with others in person and on the phone and went to church on a regular basis (Tr. 147); has no problems getting along with family, friends, neighbors, or others (Tr. 148); could pay attention "well," finished what he started (such as conversations, chores, reading books, or watching movies), and followed written and spoken instructions "well" (Tr. 148); and handled stress and changes in routine "OK" (Tr. 149).

Dr. Goff relied on Paige's unreliable statements in assessing his functioning. (Tr. 303-04). The ALJ's decision to discount Dr. Goff's opinion because it was based on Paige's subjective complaints and inconsistent with other evidence, as outlined above, was not in error.

Lastly, Paige asserts that the ALJ was forced to make the RFC assessment by interpreting the medical evidence himself and making his own conclusions about the extent of Paige's limitations because the ALJ "rejected" both Dr. Travis's and Dr. Goff's assessments, which he claims were the only medical assessments in the record. According to Paige, because the RFC assessment was not supported by the medical evidence, it was not supported by substantial evidence, and the matter should be remanded for further development. The Commissioner argues the RFC assessment made by the ALJ was supported by substantial evidence.

First, contrary to Paige's assertion, the record reflects that the ALJ did not "reject" the opinions of Dr. Goff and Dr. Travis. As determined above, based on the evidence of record, the ALJ properly acknowledged Dr. Goff's findings, but accorded little weight to Dr. Goff's opinion regarding Paige's employability and gave a portion of Dr. Travis's opinion "substantial weight" and another portion "some weight." Secondly, the RFC assessment is an administrative determination that the ALJ is responsible for assessing based on all the evidence of record. *See* 20 C.F.R. §§ 416.945, 404.1546. Here, the ALJ appropriately assessed Plaintiff's RFC based on all the evidence of record, including Dr. Travis's examination findings and related opinion, Dr. Goff's diagnoses, mental health records from WAMHC, opinions from state agency physicians and psychologists, Paige's reports (e.g., that his pain was relieved by over-the-counter medications), and other evidence. In his Decision, the ALJ provided a complete review of the medical evidence, as well as a review of Paige's testimony and the written details Paige gave concerning his daily activities and history. As discussed above, the ALJ determined based on this review of the records and testimony to

acknowledge Dr. Goff's diagnoses, but to give his opinions concerning employment factors minimal weight because they were generally inconsistent with the record. He also decided to give substantial weight to the objective assessment made by Dr. Travis, to afford Dr. Travis's opinions set forth in her medical source statement only some weight, as the medical record is devoid of any objective evidence reflecting significant physical abnormalities, and to reject her finding that Paige would be expected to have more than three absences per month because that opinion lacks sufficient support. The majority of Dr. Goff's opinions and some of Dr. Travis's opinions were based on the history given to them by Paige, which was not consistent with other evidence in the record. The ALJ found that Paige's testimony was not consistent and was not supported by objective findings or his own observations. Paige did not challenge the ALJ's findings concerning his credibility. Paige's credibility is important to the veracity of the medical opinions because some of the opinions were based on subjective complaints made by him that were not supported by objective findings. An ALJ is not required to include findings in the RFC that have been properly rejected as unsupported. *See Crawford*, 363 F.3d at 1161.

        This Court finds that the ALJ properly considered all credible evidence presented and made an assessment of Paige's RFC based on the totality of the evidence. Accordingly, the Court concludes that the RFC assessment made by the ALJ is supported by substantial evidence and is not in error.

## CONCLUSION

        As noted above, it is not this Court's place to reweigh the evidence or substitute its judgment for that of the Commissioner. It is well-established that

23

this Court is limited to a determination of whether the ALJ's decision is supported by substantial evidence. The Court finds that the ALJ's weighing of the medical opinions of Dr. Travis and Dr. Goff is supported by substantial evidence. The Court further finds that the RFC assessment made by the ALJ is supported by substantial evidence. Accordingly, it is **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff benefits be **AFFIRMED**.

  **DONE** and **ORDERED** this the **27th** day of **June, 2017**.

      s/P. BRADLEY MURRAY
      **UNITED STATES MAGISTRATE JUDGE**